IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ICON OUTDOORS, LLC,      *

    Plaintiff,      *

      v.      *      Civil Action No.: RDB-11-2967

CORE RESOURCES, INC.,      *

    Defendant.      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Icon Outdoors, LLC ("Plaintiff" or "Icon Outdoors") brings this action against Defendant Core Resources, Inc. ("Defendant" or "Core Resources"), alleging infringement of U.S. Patent No. 7,318,239 (the "'239 Patent"). Currently pending before this Court are four related memoranda: Core Resources's Opening Claim Construction Brief (ECF No. 28), Icon Outdoors's Opening Claim Construction Brief (ECF No. 29), Core Resources's Responsive Brief (ECF No. 30), and Icon Outdoors's Responsive Brief (ECF No. 31). In these memoranda, the parties request that this Court construe certain claim language from the '239 Patent pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The issues have been fully briefed and this Court held a *Markman* hearing on October 26, 2012. This Memorandum Opinion sets forth this Court's construction of the claim language discussed in the parties' briefs and during the *Markman* hearing.

## BACKGROUND

The facts set forth below are drawn from the '239 Patent (ECF No. 28-1), Plaintiff's

Complaint (ECF No. 1), Plaintiff's Opening Claim Construction Brief (ECF No. 29), Defendant's Opening Claim Construction Brief (ECF No. 28), Plaintiff's Responsive Claim Construction Brief (ECF No. 31), and Defendant's Responsive Claim Construction Brief (ECF No. 30).

The Plaintiff's Patent, the '239 Patent, is entitled "Waterfowl Hunter's Dual-Function Top Garments." It describes a top garment intended for use with chest waders and containing upper and lower portions with distinct functions. The upper portion acts as an insulated coat to keep a hunter warm above his chest wader, and the lower portion is comprised of a breathable, layering material to be worn beneath the hunter's chest wader. *See* '239 Patent, col. 2, ll. 4-22.

The novelty of the Plaintiff's invention, according to the '239 Patent, is in the garment's dual-function design. As the specification states, "None of the [garments designed for outdoor sportsmen] or any other known prior art offers a dual function top garment specifically designed for cold-weather fishing and waterfowl hunting." *Id.* at col. 2, ll. 3-11. The '239 Patent describes in detail this innovative attribute, including the location at which the two distinct portions of the garment meet. The preferred embodiment of this top garment, the '239 Patent reads, would have an upper portion "that extends above the sternum, formed as an insulating layer like a coat" and a lower portion "from the sternum to the waist, formed as a breathable layer." *See id.* at col. 2, ll. 18-21. Indeed, in at least six other instances the specification describes the upper and lower portions of the top garment as transitioning at the sternum.[1]

---

[1] In the section entitled "Summary of the Invention," the '239 Patent states that the upper portion

Initially, the '239 Patent did not identify the sternum as the transition point between the upper and lower portions of the Waterfowl Hunter's Dual-Function Top Garment.   In the original Application for a United States Patent, the inventors of the top garment, Michael Tate Wood and Bobby Windham, Jr. (together, the "inventors"),[2] located the transition point at the chest, with the upper portion "above the chest" and the lower portion "beneath the chest."   *See* Def.'s App'x D, p. 000126, ll. 14-16, ECF No. 28-4.   At other points in the original application, the inventors used similar language, describing the upper portion as located at "chest level and above" and the lower portion positioned "from the upper chest to the waist."   *Id.* p. 000130, ll. 6-10.   Finally, in the "claims" section of the original application, the inventors described the upper portion as "positioned at chest level and above" and the lower portion "attached to said upper portion and extending downward there from."   *Id.* p. 000139, ll. 9-11.

The inventors submitted their patent application to the United States Patent and Trademark Office ("PTO"), and a primary examiner of the application, Gloria M. Hale ("the Examiner"), rejected it for several reasons.   Pertinent to this case, the Examiner found that the inventors' original application did not sufficiently delineate the transition between the upper and lower portions of the Waterfowl Hunter's Dual-Function Top Garment.   First,

---

"extend[s] upwards from the sternum" and the lower portion "extend[s] downwards from the sternum."   '239 Patent, col. 2, ll. 49-52.   Later in that same section, the upper portion is described as "extend[ing] up from the sternum."   *Id.* at col. 2, ll. 58-59; *see also id.* at col. 3, ll. 3-4, 8-9, 63-65. Likewise, in the section entitled "Detailed Description of the Preferred Embodiment," the '239 Patent describes the upper portion as protruding above the chest waders, "from the sternum and above."   *See id.* at col. 4, ll. 2-4.

[2] Michael Tate Wood and Bobby Windham, Jr., the inventors of the Waterfowl Hunter's Dual-Function Top Garment, submitted the patent application for this invention.   *See* Compl. ¶ 9, ECF No. 1.   However, the Plaintiff Icon Outdoors LLC is the owner by assignment of the '239 Patent and therefore the inventors' successor in interest.   *See id.* ¶ 10.

the Examiner rejected the application's abstract because "the exact locations of the [upper and lower] portions [are] unclear in that the parameters of term 'chest level' is not clear." Def.'s App'x E, p. 3, ECF No. 28-5.   The Examiner also rejected the claims in the application for indefiniteness.   Claim 1, which used the term "chest level," was rejected because "it is not clear as to where the 'chest level' begins or ends."   *Id.*   Claim 18 was likewise rejected because the term "chest level" was deemed indefinite.[3]   Finally, the Examiner determined that the Waterfowl Hunter's Dual-Function Top Garment was not patentable because prior art, namely the REI BiPolar Tech II jacket, anticipated the inventors' claims.   *See id.* at 5-7.

In response to the Examiner's rejections, the inventors submitted an amended application, which the PTO ultimately accepted.   In the amended application, the inventors added more exact definition to the transition point between the upper and lower portions of the top garment—in short, they specified the sternum as the meeting point.   *See* New U.S. Patent Application, Def.'s App'x F, ECF No. 28-6.   For example, the inventors amended the specification to read that "it would be advantageous to provide . . . a top portion, that extends above the sternum . . . and a bottom portion, from the sternum to the waist."   *Id.* at 000088.   Similarly, the amended Summary of the Invention described the upper portion of the top garment as extending "up from the sternum" and the lower portion as extending "from the sternum [upper chest] to the waist."   *Id.* at 000089-000090.   In the amended claim 1, the inventors substituted "positioned at the sternum" for "positioned at chest level."   *Id.*

---

[3] Def.'s App'x E, p. 4.   The Examiner cited Claim 5 in its second rejection of the term "chest level" but intended to refer to Claim 18.   The Plaintiff acknowledged this typographical error in its response to the Examiner.   *See* New U.S. Patent Application, Def.'s App'x F, p. 000103, ECF No. 28-6.

at 000094.  Finally, the inventors made two amendments to claim 18.  Where the wording of this final claim located the upper portion at "chest level," the inventors substituted "at the sternum."  *Id.* at 000098.  Likewise, where the final claim described the lower portion as extending "from the chest," the inventors inserted the more specific phrasing, "a lower portion, from the sternum to the waist."  *Id.* at 000098.

It appears from the amendments to the patent application that the inventors made a concerted effort to replace all instances of the terms "chest" and "chest level" with "sternum."  However, one instance of the term "chest" survived the inventors' amendments.  In the latter portion of claim 1, which describes the lower portion of the top garment, the claim continues to read as follows: "a lower portion attached to said upper portion and extending downward from there, from the chest to the waist."[4]

In addition to these amendments, the inventors submitted "Remarks" in which they justified their amendments to their original patent application.  With regard to the Examiner's rejection of the term "chest level," the inventors explained that "[t]o the extent that 'Chest Level' is seen as imprecise, it was intended to connote at the level of the sternum as shown in the drawings."  *Id.* at 000101.  The inventors also presented reasons for distinguishing the prior art that the Examiner had identified from the Waterfowl Hunter's

---

[4] Def.'s App'x F, p. 000098.  At the *Markman* hearing, the Plaintiff attempted to explain the difference in word choice between the descriptions of the lower portion contained in Claim 1 ("from the chest to the waist") and Claim 18 ("from the sternum to the waist") as intentional.  Claim 1, the Plaintiff argued, refers to Figure 1 of the '239 Patent, which shows a version of the top garment whose upper portion could extend below the sternum.  *See* '239 Patent Fig. 1.  In keeping with the design of Figure 1, Claim 1 does not specifically identify the sternum as the point at which the lower portion begins.  Claim 18, on the other hand, is represented in Figure 2, in which the top garment's transition point is located at the sternum.  *See* '239 Patent Fig. 2.  Thus, the Plaintiff argued, Claim 18 specifically sets out the meeting point between the upper and lower portions at the sternum.  For reasons discussed in Section A *infra*, this explanation is rejected.

Dual-Function Top Garment.  They asserted that the REI BiPolar Tech II jacket was composed entirely of an insulated, waterproof, and windproof material.  The preferred embodiment of the Waterfowl Hunter's Dual-Function Top Garment was therefore distinguishable because it "has *2 distinct portions*—an *upper portion*, position at the sternum and above, having a waterproof and windproof outer shell and a *lower portion*, extending downward from the upper portion, that is breathable water-resistant material."  *Id.* at 000104 (claim citations omitted) (emphasis in original).  Because the REI jacket does not contain these two distinct portions, they argued, the garment did not anticipate the inventors' claims. The PTO accepted the revised patent application and issued the '239 Patent on January 15, 2008.  Compl. ¶ 9, ECF No. 1.

On October 18, 2011, the Plaintiff filed its Complaint, alleging that the Defendant willfully infringed the '239 Patent.  Specifically, the Plaintiff asserted that the Defendant's Decoy Wader Shirt and Youth Wader Shirt infringe claims 1, 2, 4, 5, 9, 11, 13, 18, 19, and 21 of the '239 Patent.  *Id.* ¶ 12.  On June 14, 2012, the parties submitted their Joint Claims Construction Statement (ECF No. 25) to this Court.  In the parties' joint statement, the Defendant maintained that eight terms or phrases contained in the '239 Patent required construction.  The Plaintiff agreed that seven of the eight terms required construction and asserted that one term, "sternum," needed no special construction.  Since that statement, the Defendant has agreed to accept the Plaintiff's proposed construction for the phrase "further comprises."  Consequently, there are seven disputed terms or phrases that require construction: (1) from the chest; (2) sternum; (3) an upper portion, positioned at the sternum and above; (4) a top portion, at the sternum and above; (5) a lower portion attached to said

upper portion and extending downward from there, from the chest to the waist, for wear underneath said chest wader, bibs, or overalls; (6) a lower portion, from the sternum to the waist; and (7) non-laminated material.  These seven terms appear in claims 1, 2, and 18 of the '239 Patent.

Claim 1 of the '239 Patent is an independent claim.[5]  In their response to the Examiner, the inventors identified claim 1 as the preferred embodiment of their invention. *See* Def.'s App'x F, p. 000104.  Claim 1 provides as follows:

> 1.  A dual function hunting top garment for use with chest waders, bibs and overalls, comprising:
>> an upper portion, positioned at the sternum and above and including a pair of arms, all substantially comprised of a waterproof and windproof material; and
>> a lower portion attached to said upper portion and extending downward from there, from the chest to the waist, for wear underneath said chest waders, bibs, or overalls, the lower portion comprising breathable non-waterproof and non-windproof material.

'239 Patent, col. 7, ll. 17-26.

Claim 2 of the '239 Patent is a dependent claim[6] that describes the material comprising the lower portion of the garment.  Claim 2 provides as follows:

> 2.  The dual function hunting top garment for use with chest waders according to claim 1, wherein said lower portion further comprises a breathable non-laminated material.

'239 Patent, col. 7, ll. 27-30.

---

[5] According to the glossary of the PTO, an independent claim is one "that does not refer back to or depend on another claim."  In short, an independent claim stands on its own.

[6] A dependent claim, the PTO's glossary provides, is one that "refers back to and further limits a preceding dependent or independent claim."  It includes every limitation of the claim from which it depends.

Finally, claim 18 of the '239 Patent is an independent claim.  The inventors described claim 18 as the alternate embodiment of their invention.  *See* Def.'s App'x F, p. 000104. Claim 18 provides as follows:

> 18. A dual function hunting top garment for hunting and
>     fishing, comprising:
>         a top portion, at the sternum and above, including the arms,
>         comprised of an outer shell made of a waterproof and
>         windproof shell with an insulated lining;
>         a lower portion, from the sternum to the waist, comprised
>         of a breathable non-laminated material.

'239 Patent, col. 8, ll. 35-42.

The Plaintiff and Defendant each submitted a claim construction brief (ECF Nos. 28 & 29), as well as a responsive claim construction brief (ECF Nos. 30 & 31).  They also advanced their arguments at the *Markman* hearing held on October 26, 2012.

## CLAIM CONSTRUCTION PRINCIPLES

Claim construction is a matter of law.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389-90 (1996).  "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks and citation omitted).  In interpreting a claim, a court should look first to the intrinsic evidence, *i.e.*, the patent itself, including the claims and the rest of the specification, and if in evidence, the prosecution history.  *Vitrionics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted).  Although it is within the sound discretion of a court to use extrinsic evidence as an aid in construing a claim, extrinsic evidence is "unlikely to result in a reliable

interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.

In most cases, a claim term should be construed to mean "what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Thus, the specification is "always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitrionics*, 90 F.3d at 1582) (internal quotation mark omitted). However, courts should not make the mistake of "reading a limitation from the written description into the claims." *Id.* at 1320. The Federal Circuit has "repeatedly warned against confining the claims" to the embodiments described in the specification. *Id.* at 1323.

Although claim terms are entitled to a "heavy presumption that they carry their ordinary and customary meaning," *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007), that presumption is overcome in two cases. A party challenging the ordinary meaning of a claim term may prevail "where the patentee has chosen to be his own lexicographer." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (internal quotation marks omitted). Additionally, the presumption for ordinary meaning will be rebutted "if the inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a

clear disavowal of claim scope." *Phillips*, 415 F.3d at 1319 (quoting *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002)).  A court must examine the prosecution history "to determine whether the patentee has relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." *Id.*  As with the specification, the prosecution history "provides evidence of how the PTO and the inventor understood the patent" and represents the patentee's attempt "to explain and obtain the patent." *Id.* at 1317.  Because the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*  However, where a patentee unequivocally relinquishes a potential claim construction by disavowing "a certain meaning to obtain his patent," the doctrine of prosecution disclaimer attaches and "narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

<u>ANALYSIS</u>

All but one of the terms submitted for claim construction revolve around a single issue: whether the '239 Patent defines a specific area of transition between the upper and lower portions of the Waterfowl Hunter's Dual-Function Top Garment.  The Plaintiff argues that the claim terms of the '239 Patent do not specify a transition point, and that the two portions of the garment are only defined in relation to one another and to general areas of the human body.  The Defendant, relying on the prosecution history and amended specification, seeks a construction that establishes the area of transition specifically at the

sternum.   The final dispute, involving the term "non-laminated material," concerns the attributes of the material identified as comprising the lower portion of the Waterfowl Hunter's Dual-Function Top Garment.

## A.    Construction of "from the chest"

As discussed above, "from the chest" in claim 1 is one of few remaining mentions of the term "chest" in the '239 Patent.   Although the term "chest wader" appears often in the specification, the '239 Patent contains only three instances of the term "chest" in connection to the description of the invention.[7]   The dearth of references to the term is explained by the prosecution history, during which the inventors of the Waterfowl Hunter's Dual-Function Top Garment substituted almost all mentions of "chest" and "chest level" with "sternum." *See, e.g.*, Def.'s App'x F, p. 000088-90, 000094, 000098.   Despite this prosecution history, the Plaintiff argues that this Court should construe the phrase "from the chest" in accordance with its ordinary meaning.   At the *Markman* hearing, the Plaintiff presented expert testimony that "chest," in its ordinary sense, encompasses an area of the body that extends below the sternum.

The Defendant stipulates to the Plaintiff's expert testimony regarding the ordinary meaning of "chest," yet argues that in this case the ordinary meaning should not prevail. The prosecution history reveals that in order to obtain a patent for the Waterfowl Hunter's Dual-Function Top Garment, the inventors had to provide a more definite description of the transition point between the upper and lower portions of the garment.   Because the

---

[7] The term "chest" appears twice in the first section, entitled "Field of the Invention."  *See* '239 Patent, col. 1, ll. 18-20.  The only other mention of the term in connection with a description of the invention is in claim 1, the construction of which is in dispute.

inventors substituted "sternum" for almost all mentions of the term "chest," the Defendant argues that this rare instance of "chest" should be construed to mean "sternum."

Although the ordinary meaning that the Plaintiff requests would usually prevail, the Defendant has successfully overcome the presumption for ordinary meaning in this case.  It is clear from the prosecution history that one of the main reasons the Examiner rejected the inventors' original patent application was the indeterminacy of the transition point between the upper and lower portions.  Indeed, the Examiner stated in claim 1 that "it is not clear as to where the 'chest level' begins or ends."  *See* Def.'s App'x E, p. 3.  The inventors' response to this rejection is crucial to the construction of this claim term.  They did not simply substitute "sternum" for "chest level" in the two specific locations that the Examiner cited.  Instead, they inserted "sternum" for almost every appearance of the term "chest" and added the term in several other parts of the specification.

Particularly telling is the inventors' amendment with regard to the invention's preferred embodiment.  *See* Def.'s App'x F, p. 000088.  In the original application, the term "chest" did not appear once in the section describing the invention's preferred embodiment.  *See* Def.'s App'x D, p. 000128.  In the amended description, the inventors inserted details pertaining to the location of the upper and lower portions and used the term "sternum."  *See* Def.'s App'x F, p. 000088.

The Plaintiff argues that this particular amendment does not lend support to the Defendant's proposed construction.  Although the Plaintiff acknowledges that the '239 Patent describes the preferred embodiment as having a transition point at the sternum, the term that requires construction is in claim 1, which, they assert, does not relate to the

preferred embodiment.  Thus a limitation on the design of the preferred embodiment should not be read into the meaning of "from the chest" contained in claim 1.

Though the Plaintiff's argument would neatly dispose of several claim construction disputes in this case, it is not supported by the '239 Patent specification and prosecution history.  In construing claims, the specification is the "single best guide to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315 (quoting *Vitrionics*, 90 F.3d at 1582) (internal quotation mark omitted).  In this case, the '239 Patent's specification contains numerous descriptions of the upper and lower portions as transitioning at the sternum.  By contrast, nowhere does the patent distinguish between an embodiment in which the transition point occurs at the sternum and an embodiment in which the transition point occurs somewhere below the sternum.  Moreover, though the Plaintiff attempts to distance claim 1 from the description of the preferred embodiment, the inventors themselves identified claim 1 as the "preferred embodiment" of their invention.  *See* Def.'s App'x F, p. 000104.  For these reasons, the Plaintiff's argument is unavailing.

Additionally, the Plaintiff argues that claim 1 corresponds to Figure 1 of the '239 Patent, and since Figure 1 depicts a transition point occurring below the sternum, "from the chest" cannot be construed to mean "from the sternum."  This argument also fails for lack of support in the '239 Patent specification.  Contrary to the Plaintiff's assertion, the '239 Patent identifies Figure 1 as a depiction of the preferred embodiment of the Plaintiff's invention.  *See* '239 Patent, col. 3, l. 54–col. 5 l. 17.  The '239 Patent clearly states—and the Plaintiff recognized at the *Markman* hearing—that the preferred embodiment involves a transition point at the sternum.  *See* Def.'s App'x F, p. 000088.  Assuming, as the Plaintiff

argues, that Figure 1 is associated with claim 1, then claim 1 should correspond to the attributes the inventors included in their "Detailed Description of the Preferred Embodiment," and "from the chest" must therefore mean "from the sternum." *See, e.g.,* '239 Patent, col. 3, ll. 60-65.

At bottom, the Defendant's argument rests on the prosecution history, which reveals that the inventors located the invention's transition point at the sternum in order to overcome one of the Examiner's rejections. The Plaintiff argues that this prosecution history should not influence this Court's construction of the claim terms. Acknowledging that a patentee may relinquish a potential claim construction when he amends a claim or overcomes a rejection, *see, e.g., Bell Atl. Network*, 262 F.3d at 1268, the Plaintiff asserts that in this case the inventors never conclusively and unambiguously disavowed the meaning it now seeks.

In some circumstances, the doctrine of prosecution disclaimer narrows a claim's scope to exclude a potential meaning that was surrendered by the patentee during the prosecution history. However, "where the alleged disavowal of claim scope is ambiguous," the doctrine of prosecution disclaimer should not be applied. *Omega Eng'g, Inc. v. Raytek Corp.*, 332 F.3d 1314, 1324 (Fed. Cir. 2003). In *Omega Engineering*, the United States Court of Appeals for the Federal Circuit was unwilling to apply prosecution disclaimer where the inventor's statement was "amenable to multiple reasonable remarks." *Id.* In that circumstance, the prosecution history was "far too slender a reed to support the judicial narrowing of a clear claim term." *Id.*

14

In this case, however, the inventors' statement is not ambiguous or amenable to multiple interpretations.  The inventors explained in their "Remarks" to the Examiner that "[t]o the extent that 'Chest Level' is seen as imprecise, it was intended to connote at the level of the sternum as shown in the drawings."  Def.'s App'x F, p. 000101.  The inventors thus overcame the Examiner's rejection based on indefiniteness by narrowing the term "chest" to "sternum."  The Plaintiff's disavowal of a broader claim scope for the term "chest" is clear.  *See Omega Eng'g*, 334 F.3d at 1324 ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.").  Contrary to the Plaintiff's argument, this prosecution history provides information crucial to claim construction because it represents the patentee's attempt "to explain and obtain the patent."  *Phillips*, 415 F.3d at 1317.

In conclusion, the prosecution history shows that the inventors overcame the Examiner's rejection by specifically identifying the sternum as the transition point between the upper and lower portions of their invention.  The prosecution history also shows that the Examiner, in ultimately accepted the patent application, understood the patent in these terms.  *See id.* (stating that prosecution history "provides evidence of how the PTO and the inventor understood the patent").  For these reasons, this Court construes "from the chest" in claim 1 of the '239 Patent to mean "from the sternum."

**B.    Construction of "sternum"**

The phrase "sternum" is found in claims 1 and 18, as well as throughout the specification of the '239 Patent.  The Plaintiff initially argues that "sternum" needs no

15

specific construction because it is well understood to mean the ventral bone and cartilage that joins the ribs. However, if this Court is inclined to construe the term, the Plaintiff requests that it look to extrinsic evidence, namely the *Merriam Webster Online Dictionary*, and construe "sternum" to mean "the compound ventral bone or cartilage that joins the ribs." The Defendant agrees that this Court should look to extrinsic evidence, in particular Henry Gray's *Anatomy of the Human Body*, and requests the following detailed description of the sternum: "an elongated flattened bone having an average length of 7 inches in adults from which the ribs radiate. The sternum extends downward from an anterior end proximate the jugular to a posterior end known as the xiphoid process." *See* Def.'s Br. 9, ECF No. 28.

The claim term "sternum" is disputed by the parties; therefore, it requires the Court's construction. Because the '239 Patent does not offer description of the sternum, this Court must look to extrinsic evidence to construe the term. As the Court of Appeals for the Federal Circuit explained in *Phillips v. AWH Corp.*, in some cases the ordinary meaning is not difficult to discern. *See* 415 F.3d at 1314. "[C]laim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* In these circumstances, "general purpose dictionaries may be helpful." *Id.* at 1314. Heeding this guidance, this Court finds that the Plaintiff's proposed construction reflects the widely accepted meaning of the term "sternum."

Both parties' definitions originate in reliable extrinsic sources. While the Plaintiff offers a simple dictionary definition of the term, however, the Defendant argues for a more detailed, complex construction. That construction is not based on the most comprehensive definition provided by Gray's *Anatomy*. Instead, the Defendant pulls piecemeal from the

source's lengthy and exhaustive description of the bone. *See* Def.'s App'x B, pp. 124-25. Moreover, some of the details included in the Defendant's requested construction are not relevant to the task at hand—that is, interpreting the claims based on the "patent itself, including the claims and the rest of the specification." *Vitronics Corp.*, 90 F.3d at 1582. The plainest example of this is the Defendant's inclusion of the average length of the sternum, which is not mentioned anywhere in the '239 Patent's specification or claims.

The Plaintiff's requested construction provides a clear definition for an important claim term without delving into details that are of little value to the claim at issue. For this reason, this Court construes "sternum" to mean "the compound ventral bone or cartilage that connects the ribs."

## C.    Construction of "an upper portion, positioned at the sternum and above"

The construction of the claim 1 term "an upper portion, position at the sternum and above" is at the crux of this case, and much of the same evidence that was useful in construing "from the chest" in Section A of this Memorandum Opinion also applies here. The Plaintiff asks this Court to construe the term in accordance with ordinary meaning. The Defendant, on the other hand, maintains that the Plaintiff relinquished a construction based on ordinary meaning in the prosecution history. A review of claim 1, the specification, and the prosecution history compels the conclusion that this term should be interpreted such that the upper portion of the Waterfowl Hunter's Dual-Function Top Garment begins over the sternum.

In advancing an argument for ordinary meaning, the Plaintiff seeks a construction that would allow for a transition point that begins at or below the sternum. As stated in

Section A, however, the prosecution history reveals that in order to obtain a patent for the Waterfowl Hunter's Dual-Function Top Garment, the inventors had to describe more precisely the transition point between the top garment's upper and lower portions.  They cured their patent application's indefiniteness by locating the transition point at the sternum. To allow the Plaintiff to broaden the scope of the term at this stage would mean granting the Plaintiff an interpretation that was relinquished in seeking their patent.

Moreover, the '239 Patent specification is replete with references to the sternum as the transition point between the upper and lower portions of the top garment.  As already detailed, the inventors substituted the term "sternum" for the terms "chest" and "chest level" throughout their amended patent application.  *See, e.g.*, Def.'s App'x F, p. 000088-90, 000094, 000098.  Even where there was no description of the transition point, the inventors added "sternum" to provide more definition to the invention's design.  Considering that the patent specification is the "single best guide to the meaning of a disputed term," *Phillips*, 415 F.3d at 1315 (quoting *Vitrionics*, 90 F.3d at 1582) (internal quotation mark omitted), the numerous references to the sternum in the '239 Patent suggest that when construing claim terms involving the upper and lower portions of the top garment, the transition point is at the sternum.

The Plaintiff rebuts this emphasis on the patent's specification, asserting that Defendant's proposed construction fails because it imports a limitation from the specification into the claim term.  This practice, the Plaintiff argues, is a "cardinal sin" of claim construction.  *Phillips*, 415 F.3d at 1320.  The Plaintiff is careful to maintain that no limitation on the start or end point of the upper and lower portions exists in the '239

Patent's specification.   Yet the Plaintiff argues that even if there were such a limitation, to accept the Defendant's proposed construction would violate an important principle— indeed, a cardinal sin—of claim construction.

Because the Plaintiff relies heavily on the notion that reading a limitation from the specification into a claim is a cardinal sin of claim construction, a careful analysis of the case law on which the Plaintiff relies is key to resolving this dispute.   One of the major cases in which the Federal Circuit regarded such a practice as a cardinal sin was *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1191 (Fed. Cir. 2002).   Three years after that decision, the Federal Circuit, in the case *Phillips v. AWH Corporation*, 415 F.3d 1303, reviewed its earlier analysis in *Texas Digital*.   The appellate court ultimately found that *Texas Digital* had "placed too much reliance on extrinsic sources . . . and too little on intrinsic sources, in particular the specification and prosecution history."   *Id.* at 1320.   The underlying concern with "avoid[ing] the danger of reading limitations from the specification into the claim," the *Phillips* court stated, was sound.   *Id.* at 1323.   However, the court's analysis in *Texas Digital* was inconsistent with the Federal Circuit's firmly established principle that the specification was the "single best guide to the meaning of a disputed term."   *Id.* at 1321.   "Heavy reliance of the dictionary divorced from the intrinsic evidence," the Federal Circuit warned, "risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."   *Id.* at 1321.   Instead, a court should look to the specification as context for the claims contained in the patent, all the while being careful to recognize "whether the patentee is setting out specific examples of

the invention . . . or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.* at 1323-24.

The Federal Circuit in *Phillips* explained at great length the significance assigned to the specification during claim construction.   That principle, which has a "long pedigree" in Supreme Court and Federal Circuit opinions, is premised on the fact that claims are part of a larger written instrument and should be "read in view of the specification, of which they are a part." *Id.* at 1315 (quoting *Markman*, 52 F.3d 978-79) (internal quotation marks omitted). The specification, the Federal Circuit asserted, is the "primary basis for construing claims" precisely because the meaning of claim terms is based on the descriptions in the specification.   *Id.* (internal citations omitted).   Importantly, the weight assigned to the specification reflects the statutory requirement "that the specification describe the claimed invention in 'full, clear, concise, and exact terms.'" *Id.* at 1316 (citing 35 U.S.C. § 112, ¶ 1).

Following the guidance offered in *Phillips*, this Court finds that the prosecution history and specification make evident the meaning of the term "an upper portion, positioned at the sternum and above."   In keeping with the principle that the specification is the "primary basis for construing claims," *id.* at 1315, it is clear that the disputed claim term should be interpreted to include a transition point at the sternum.   Where the inventors added the term "sternum" to cure the patent application's indefiniteness, they were not simply "setting out specific examples of the invention." *Id.* at 1323.   Rather, they were adjusting the invention's attributes in order to obtain a patent.   For these reasons, this Court construes the phrase "an upper portion, positioned at the sternum and above" to mean "a

separate and distinct portion of a garment that begins over the sternum and extends upward from there."

### D.     Construction of "a top portion, at the sternum and above"

The claim term "a top portion, at the sternum and above" is found in claim 18 of the '239 Patent and describes the position of the top portion of the Waterfowl Hunter's Dual-Function Top Garment.  This claim term is distinguishable from the similar claim term in claim 1, construed in Section C of this Memorandum Opinion: in claim 1, the inventors referred to an "upper portion," whereas in claim 18 they used the phrase "top portion."

Despite the slightly different terminology in claims 1 and 18, it is evident that the two terms are counterparts.  Indeed, the '239 Patent used the terms "top" and "upper" interchangeably throughout the '239 Patent.  *See, e.g.*, '239 Patent Abstract (referring to the upper region of the garment as both the "top portion" and the "upper portion"); col. 2, ll. 18, 25 (same).  Thus, this claim term should be construed in the same manner as the claim term addressed in Section C.  *See Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.").  For the same reasons that applied to the term "an upper portion, positioned at the sternum and above," the prosecution history and specification compel a construction of this claim term that indicates a transition point at the sternum.

The Plaintiff argues here, as it did previously, that interpreting this claim term as the Defendant requests would amount to committing one of the "cardinal sins" of claim construction.  *Phillips*, 415 F.3d at 1320.  Following the Federal Circuit's guidance in *Phillips*,

this Court finds that the Plaintiff's argument carries no weight here, because the amended details in the specification were meant to be coextensive with the claims themselves.  *See id.* at 1323.  The specification being the "single best guide to the meaning of a disputed term," *id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582) (internal quotation mark omitted), this Court construes "a top portion, at the sternum and above" in claim 18 to mean "a separate and distinct portion of a garment that begins over the sternum and extends upward from there."

**E.    Construction of "a lower portion attached to said upper portion and extending downward from there, from the chest to the waist, for wear underneath said chest wader, bibs, or overalls"**

The next claim term to be addressed is found in claim 1 and describes the lower portion of the Waterfowl Hunter's Dual-Function Top Garment.  As with the disputes concerning the upper portion claim terms, the dispute over this term centers on the question whether the claim terms establish a transition point at the sternum.  The Plaintiff requests a construction based on ordinary meaning, while the Defendant argues that a construction reflecting the language in the specification and the prosecution history should prevail over ordinary meaning in this case.

As discussed above, the Examiner of the original patent application required the inventors to define more precisely the point of transition in their top garment.  In response, they pinpointed the sternum as the transition point and inserted numerous statements throughout the '239 Patent that the garment's two portions would meet at the sternum. Because the inventors narrowed the term "chest" to mean "sternum," relinquishing the term's ordinary meaning, the presumption for ordinary meaning is overcome in this case. Accordingly, this Court construes "a lower portion attached to said upper portion and

22

extending downward from there, from the chest to the waist, for wear underneath said chest wader, bibs, or overalls" to mean "a separate and distinct portion of a garment that begins over or immediately adjacent to the sternum and extends downward from there to the waist."

## F.   Construction of "a lower portion, from the sternum to the waist"

The claim term "a lower portion, from the sternum to the waist" appears in claim 18 of the '239 Patent.  Although the parties initially disagreed over the construction of this term, the Plaintiff has since expressed a willingness to accept the claim construction proposed by the Defendant.  *See* Pl.'s Responsive Br. 9, ECF No. 31.  Therefore, this Court construes "a lower portion, from the sternum to the waist" to mean "a separate and distinct portion of a garment that begins over or immediately adjacent to the sternum and extends downward from there to the waist."

## G.   Construction of "non-laminated material"

The final claim term requiring construction is "non-laminated material."  It appears in claims 2 and 18 and describes the material comprising the lower portion of the top garment. The Plaintiff requests a construction based on the dictionary definition of the term.  The Defendant, on the other hand, argues that because the patentees chose to be their "own lexicaographers," *Bell Atl. Network*, 262 F.3d at 1268, the term's ordinary meaning does not provide the appropriate construction in this circumstance.  Instead, the Defendant argues, the construction should reflect the definition contained in the specification.  In a section entitled "Detailed Description of the Preferred Embodiment," the '239 Patent describes the lower portion as "made up of any breathable non-laminated fabric material (to the exclusion

of any waterproof or windproof laminated fabrics or non-breathable materials).'' '239 Patent, col. 4, ll. 33-35.  The Defendant contends that this statement reveals the Plaintiff's choice to be his own lexicographer.

To determine whether a plaintiff has chosen to be his own lexicographer, a court "must examine the intrinsic evidence to determine whether the patentees have given the term an unconventional meaning." *Bell Atl. Network*, 262 F.3d at 1268 (internal citation omitted).  "The specification acts as a dictionary when it expressly defines the terms used in the claims or when it defines terms by implication." *Id.* (internal citation omitted).  An "explicit statement of redefinition," however, is not required. *Id.* Rather, a claim term can be redefined if the specification provides "guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed." *Id.* (internal citation omitted).

This Court finds that the patentees redefined the term "non-laminated material." The '239 Patent states that the term "non-laminated material" excludes "any waterproof or windproof laminated fabrics." *See* '239 Patent, col. 4, ll. 34-35.  Though this statement is inconsistent with the dictionary definition of "non-laminated," the patentee is permitted to be his own lexicographer. *Bell Atl. Network*, 262 F.3d at 1268.  By excluding certain attributes from the term "non-laminated fabric material," '239 Patent, col. 4, ll. 33-35, the inventors gave the term an unconventional meaning that would apply in the context of the patent. *See Bell Atl. Network*, 262 F.3d at 1268.  Thus the '239 Patent's specification provides guidance as to the meaning of the term at issue, and this Court will rely on that guidance in construing the claim term. *Id.*

The Defendant also requests a construction of "non-laminated material" that excludes "non-breathable materials." Such a construction, though, is unwarranted. The '239 Patent describes the material of the lower portion of the top garment as both "breathable" and "non-laminated." *See, e.g., id.* at col. 4, l. 33. Thus an interpretation that incorporated "breathable" into "non-laminated" would render the claim term "breathable," which appears throughout the '239 Patent, redundant.

For the foregoing reasons, this Court construes "non-laminated material" to mean "a material that is made up of a single layer having no waterproof or windproof layer bonded to another layer." This phrase is found in claims 2 and 18 of the '239 Patent.

<u>CONCLUSION</u>

For the reasons stated above, the disputed claim terms are given the definitions set forth in this Memorandum Opinion.

A separate Order follows.

Dated:        November 14, 2012        /s/_____

                                        Richard D. Bennett
                                        United States District Judge